Case No. 14-1286, Canyon Fuel Company, LLC, et al. Petitioners v. Mine Safety and Health Administration and Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health. Case No. 14-1285, Rosebud Mining Company, et al. Petitioners v. Mine Safety and Health Administration and Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health. Mr. Moore for the petitioners, Ms. Dunbar for the respondent. Mr. Moore, good morning. Good morning. May it please the Court, these cases come to the Court after having a somewhat synergistic course of litigation. Rosebud was litigated first. They started out with denials of the petitions. The ALJ granted them. It went up to the Assistant Secretary, who continued to grant them but added additional conditions, and it was remanded to clarify the record on a couple of issues. Canyon Fuel waited for the first Assistant Secretary decision in Rosebud and then litigated it on the very limited issues of whether or not certain conditions would be imposed in a grant of the petition. They involved the issue of electronic surveying instruments, which are not anything exotic, just so we're all clear. An electronic surveying instrument is an instrument that you see out on the roadside in construction sites. It has been in common in the mining industry and in general industry since approximately 1985. It is the standard of the industry, and it is ten times more accurate than old mechanical surveying instruments. Am I right that there are non-permissible – well, I know there are non-permissible electronic, but also permissible? There are no permissible electronic surveying instruments. All right. So we're just dealing with – all of them are non-permissible then? Right. Okay. The only – back in the early 1980s, there was an approved, I believe, distance – well, it was a data log or something of that nature that was approved. And then – and Mr. Ryder, our expert, managed to dig one up. Didn't find – see any significant differences except more caulking around the outside. But there is no approved permissible surveying equipment. Having said that, they are – in fact, they are different than other mining equipment. Permissibility applies to everything used in the three locations that we're talking about, and that includes continuous miners, roof boulders, shuttle cars. And there's a significant difference because if you're using a continuous miner, it's up at the face. It's digging. It's encountering rock. It is subject to a fair amount of abuse because it's out beyond supported roof when it's initially mining. Same with roof boulders. They are boulting unsupported roof. The assistant secretary in this case rejected the findings of the judges. It's not one, but it's two judges. And actually engaged in fact-finding credibility determinations on his own. So under our precedent, isn't the standard of review settled? Under your precedent, the standard of review is settled. The question is whether or not he can engage in the sort of credibility findings that he did. The Kaye case in this circuit says he can. However, if you look at the other cases that we've cited in our reply brief, the real question becomes how do you view that? And we all know that historically you accept the finders of facts credibility determinations because they listened to the witnesses. And they saw the witnesses. And in this particular case, that's particularly significant because we have two different judges who listened to essentially the same expert witnesses and made a determination as to their credibility. So it's a Danover review and we have to find whether there was substantial evidence? You have to find whether substantial evidence supports the assistant secretary's decision. And I would submit that the fact that he went contrary to the ALJ's findings would suggest that his findings should be viewed with some reservation, if not skepticism. That's an interesting standard. Would you agree that the fact that there is evidence contrary to his finding does not mean there is not substantial evidence?  Well, we would submit that the evidence he relied on is generalized evidence that does not mean to substantial evidence test when placed up against specific evidence. For example, let's take the issue of dust inside an electronic surveying instrument. He rejected both Mr. Ryder's test, Mr. Ryder's testimony on examining the insides of instruments and a discussion of sealing and the use of the IP66 standard. And he relied on Mr. Huntley. What Mr. Huntley testified to was that when they test for permissibility, they layer coal dust on the electric components and see if it will ignite. Mr. Huntley did not testify as to the potential for layering, actual layering, and the likelihood of that. We are talking, I would submit... And the likelihood of what, just so I'm clear? One, float coal dust getting inside the instrument in the first place, and second, float coal dust igniting if it layers on the electronics on the inside. No question that when the mine is operating, the dust can layer. Is that not correct? Well... Based on this record? Not on the inside of instruments. You can get some dust into the instruments. Right. But that doesn't mean it will layer as we spoke. And we frankly, Mr. Huntley, who the Assistant Secretary relied on, who's obviously his subordinate, didn't do any tests to see if these components would ignite methane. He rejected, for example, also, the fact that there are thermal resistors in this, and that means it shuts down at a certain temperature. He said, well, they could malfunction. Well, okay, you can make that argument on every type of equipment, be it... And it simply is not, we believe, substantial evidence to suppose that they won't work. When we all know that thermal resistors from around, for example, my cell phone in my pocket, shuts down at a certain temperature. Because it's too hot. Also shuts down when it's too cold. Well, that's the same sort of technology we're talking about here. So I guess what I'm trying to understand in your argument, in part, is given the MINE Act and Congress's determination to place primary emphasis on the safety and health of the miner, why is not the fact that, as you admit, dust could get into these instruments, and that they are not shown to be fail-safe, or we can even ignore the fail-safe one, sufficient to support a finding here? I mean, you say they were generalized findings. Yes, generalized testimony. And he was relying on that, yes. But given the emphasis of the MINE Act, why isn't that appropriate evidence on which to rely? Well, I think you have to look at the whole test. Okay. And that all you're trying to do is provide the equal measure of protection, which you have done. And he listed a whole bunch of redundant protections. You've replaced one protection with a number of others, a whole laundry list of protections. And that, we submit, is sufficient. So did he not find that the demunition of protection was not fully replaced by what was being proposed? That's what he found, but we don't believe that's supported on this record. I see. We also think he ignored, for example, the whole issue of ventilation. And, of course, we have a ventilation requirement in here, and you're supposed to check, make sure the ventilation is up to what it's supposed to be on the section. Well, there was a reference to all the violations that had been issued for not maintaining the ventilation system properly. There have been violations issued. That does not mean that what we're talking about... If you go on that premise, Your Honor, then you also need to look at the violations for permissible equipment, which is... And I cannot quote you where they are in the most frequently cited standards. It's on MSHA's website, but it's in the top ten. And if you go with that theory, well, I don't think you can base your decision on the fact there may be violations, nor do I think you can base your decisions, as he did, on the fact that methane detectors may malfunction. These are the methane detectors the Secretary has approved and are used throughout the industry, day after day, shift after shift, hour after hour. And yet he says, oh, well, there may be a delay in them. Well, if there's a delay in them in terms of somebody using them in conjunction with surveying, there's certainly a delay in them when you're using them to test at the face where you're actually going to get methane if you're going to get it. The fact that he just simply wrote off ventilation. Also, I think the Dugout Canyon mine is probably the best example of why his requiring cessation of production is not supportable. Dugout Canyon mines 10 to 12 entries at a time, and what you do is you recycle from face to face. They have a provision in their ventilation plant, which is approved and required by MSHA, that they cannot do anything downwind of the continuous miner. That's roof bolt, clean up, anything like that. So if they're going to use electronic surveying equipment, that applies also. The electronic surveying equipment will always be in what is known as another split of air, because the air comes up to the section in the middle entry and splits. Some goes to the left-hand side, some goes to the right-hand side. If they were mining on the left-hand side, you're going to be on the right-hand side. Well, the assistant secretary didn't consider those sorts of things. He rejected, for example, some of the Canyon fuel mines use ventilation. It's an advance, and what happens is the air, as is coming off the face where you are mining, goes into a tube and is conveyed out of the section. What that means is if I'm standing in any entry, I'm in fresh air, even if I'm in by the last open crosscut. And that is a significant fact. Further... Is the phrase in by just means it's just if you're in it or you're by it? It's a directional phrase that we've wrestled with throughout my career. What it means is if I'm standing here and the working faces are where the wall behind you all are, those faces are in by where I am. What it means in terms of the last open crosscut, the last open crosscut, as we described, you mine a series of entries, as few as two, as many as 10 to 12, going into the mine, and you drive crosscuts between them so they're all connected. It's a grid like that. The last open crosscut starts at the out-by rib or the edge of the pillar going toward the face in that last open crosscut. It's a crosscut that doesn't have a permanent stopping in it, that equipment travels in, and the air is brought up and it travels through that crosscut to the face, depending on which face you mine. So it's only a locational term, not a directional term. Right. All right. Right. Well, it's a directional in that if I'm standing here and the wall is in base, it's in by, and the back door is out by. But it's a term of art in the industry, which we've all wrestled with. The assistant secretary, both in his requirement to cease production and his requirement with respect to float coal dust, for example, failed to consider some significant facts that I think make his decision arbitrary. First of all, he failed to consider that for float coal dust to actually be explosive, it has to be at a certain level, which is 25,000 times the level permitted for respirable coal dust in the face areas. Respirable coal dust has a 2-milligrams per cubic meter standard. Float coal dust to be explosive has to be 25,000 times that. But that's not all what he failed to consider. He failed to consider the fact that this is an optical instrument. I'm standing there with an electronic surveying device, and I look through the lens, and I'm generally looking anywhere from 100 to 300 feet straight ahead to somebody who's holding a plumb bob attached to the roof so it hangs down straight. And I've got to see that string. Well, it doesn't take much dust to actually obscure that. Further, I am measuring to that string using the device, and it's a laser that sends it to the string and bounces it back. Well, if you have any dust in the air, it doesn't take much to get to the point where you can't survey accurately and you would have to stop. And that's way short of any explosive. Are you relying at all on the fact that Rosebud, for 20 years, used this electronic equipment and has never been cited for it? Well, yes and no, Your Honor, because Rosebud wasn't alone, but Judge Lesniak thought that was very significant. It's interesting that the only person that MSHA put on who is at all familiar with electronic surveying, Mr. Permolino, had been a surveyor before he went to MSHA and had used electronic equipment without any problems. I recognize that the case law is you can't, if they were to write a violation, you couldn't argue why you permitted it. But the judge was looking at, well, people didn't think this was a significant issue, and then it became a significant issue. And finally, before I cut into too much of my rebuttal time, may I also say that what he didn't consider in any significant way is the fact that electronic surveying instruments are more accurate and safer and they're more efficient. They are ten times more accurate, and that is significant, because you not only are mining in mines like Rosebud, you have mines, old abandoned mines, that you are trying to avoid because they may be full of water, or what's known as black damp, which is just oxygen, low oxygen. You are voiding lakes, rivers, and the like. The more accurate it is, the better. And there was testimony from Mr. Hartzog, who's been surveying his entire career, that it is more efficient to survey with electronic surveying equipment. You are spending less time on a section. And the assistant secretary made a point of saying, well, if you are surveying your production, you have to worry about equipment. Well, that's true if you're using mechanical surveying equipment, and since it takes longer to survey, it is. For that reason, it's an argument that, frankly, I don't think it should carry any weight. I'm into my rebuttal time, so if there are no more questions. All right. Thank you. Ms. Dunbar. Thank you, Your Honors. Good morning. May it please the Court. My name is Lynn Dunbar, and I represent the Secretary of Labor by way of his delegated authority to the Assistant Secretary of Labor for Mine Safety and Health, whose decisions are before us today. I also represent the Mine Safety and Health Administration, otherwise known as MSHA. With me at council table is Mr. Chris Schuman. He is the appellate counsel in our office. I'd like to begin with a brief overview of the permissibility standards, if you'd like. Just three or four sentences. I just want to point out that the Mine Act and MSHA's mandatory safety standards require multiple safety measures to protect against fires, ignitions, and explosions. Because the operator's alternative method eliminates MSHA's permissibility standards for electronic surveying equipment, the Assistant Secretary's conditions are necessary to offset that loss of protection. The goal of the permissibility standards is to prevent the use of equipment that could be a potential source for methane or coal explosion or fire. Now, the areas in or in by the last open crosscut, in return air, and within 150 feet of pillar workings or longwall facers, are hazardous conditions with an increased risk of methane and coal dust due to mining activity. I have two points that I want to emphasize today. My first point is the operators got the exemption they needed from the permissibility requirements to allow the use of electronic surveying equipment in these high-risk areas. As opposing counsel mentioned, due to the current unavailability of permissible electronic surveying equipment or viable new mechanical surveying equipment, the Assistant Secretary granted the petitions. And he just didn't rubber stamp it. Opposing counsel brought to the Court's attention that initially MSHA denied these petitions. They were under the impression that there was adequate mechanical equipment available for the operators to use. In fact, some of the mines testified on the record that they do indeed have mechanical surveying equipment at their disposal. However, they did testify that it's used equipment. It may be hard to repair, find replacement parts. The judge heard this. The judge decided that based on this unavailability of permissible or new viable used mechanical equipment, that these petitions needed to be granted. The Assistant Secretary agreed with that finding, that there was no practical alternative here. So I just wanted to point out that the operators did get the exemption they sought. Can I ask you, is there anything in the record that tells us the percentage of mines that are using mechanical, the percentage of mines that are using these non-permissible? You get a picture of old worn out, not worn out, but old equipment, the mechanical, and this electronic equipment that if the safety measures are in place can be used, do a better job, and so forth. And there just doesn't seem to be any picture of where the mining industry is in this, whether they're still back with 90 percent of them using mechanical or what. There's nothing in the record that says that. No, I don't recall any information to that effect in the record. Maybe opposing counsel has a better idea of that, but it was not on the record. I know in the first trial, I think the operators testified that they did not have mechanical surveying equipment. They couldn't find it if they wanted to. But in the second trial, there was definitely testimony by, I believe, every one of the operators that they did indeed have in their possession mechanical equipment. Okay. So this, while I'm on the subject of the availability, I just want to mention the Assistant Secretary's condition on viable new mechanical surveying equipment. And if that equipment were to become available, then these conditions would no longer be needed. The Assistant Secretary found that if new mechanical surveying equipment becomes available and accurate surveying can be performed under the standards, there would be no need for these modifications. He made that very clear to all of the operators involved. And I just would note for the Court that the Secretary's Rules of Practice for Petitions for Modification do contain a provision for revoking previously granted modifications based on a change of circumstances or because findings which originally supported the modification are no longer valid. That would be the case. Could I just ask, to shut down production of a mine, does that mean in order to meet the Assistant Secretary's condition that the mine has to be out of operation for a minimum period of time? There was testimony about how much of a surveyor's time is spent in or in by the last up and cross cut. If I recall correctly, I think it was 2 to 3 percent of a surveyor's time. And with regard to the return error, I believe the testimony was 12 to 13 percent of the surveyor's time. So totally you have about 15 percent of the surveyor's time spent in these high risk areas. So that means how long does the mine have to be in non-production mode? Well, if a surveyor is surveying for 8 hours a day, maybe 15 percent of those 8 hours. We don't know. I mean, I'm a mine operator. I have to shut down the mine for a week before the, well, I'm just asking the question, before the surveyor can go into these potentially dangerous areas? No. While the surveying is taking place, right before the surveyor goes into that high risk area to perform the surveying. So if I have a mine that has 20 sections in it, and the surveyor wants to go into one section, even though the sections are interconnected, the surveyor can still go into that one section because there is no mining going on in that particular section? That's correct. Even though methane and dust may seep in from another section? Well, due to the air flow. That assumes the ventilation system is working. Yes. I see. Yes, it does. And it would just pertain to the one section and only when the surveyors are in these high risk areas, not when they're in other areas of the section, but only when the surveyors want to survey in or in by, within 150 feet of the long wall or pillar workings, or in the return area. So how often is the secretary at these mines? Not the secretary. The assistant secretary? The surveyor. Oh, the surveyor. There was testimony that they are in the mines, they can be there two or three times a week. Yeah. And it would only be in the section where the surveying would be occurring. I think opposing counsel alluded to the fact that many of these mines have more than one section operating. So it's not shutting down the entire mine. It's just shutting down the one section where the surveyors are working in those high risk locations. The second point I want to raise. So what would make an electronic surveying equipment permissible? There was testimony by the assistant, by MSHA's expert witness, Chad Huntley, when he examined the battery packs, that he thought he himself could make the equipment permissible. I don't know the details of what it would take to make it permissible, but he testified that he thought it could be done. And there was also testimony in the record about equipment that's being used in other countries and the hope that these companies might submit their equipment to MSHA for approval and certification as permissible someday. That day has not yet come. We don't know how soon that day will come, if it will come. And with regard to the mechanical surveying equipment, the operators examined some of it in the Parkwood-Rosebud trial. They thought it wasn't of a quality that they would want to purchase. So we don't know if another company or that perhaps that same company will improve their product and come out with a piece of mechanical surveying equipment that will be accurate enough for surveying in underground coal mines. We don't know when that day will come. And so that's why the assistant secretary... You said mechanical. Is that what you meant? Pardon? Your sentence referred to mechanical equipment, sufficiently accurate mechanical equipment. Yes. What does accurate mean? I thought the record here was that the assistant secretary's position was that mechanical equipment may not be as accurate as electrical, but you could repeat the mechanical survey and through repetition end up with something that's as accurate a survey as would occur with electronic equipment. That's correct. So by repetition, does that double the amount of surveyor time in these dangerous areas? It could, but I would like to point out that these circular surveys, the loop surveys that the surveyors conduct can be done with mechanical equipment and electronic surveying equipment. There was testimony that they do them with both types of equipment in order to increase the accuracy, the surveying accuracy. But the electronic is all non-permissible, right? At this time, yes. And they're using it according to conditions that you've imposed? Yes. All right. These mines are using the electrical equipment right now if they choose to do so under these conditions. All right. What is your explanation for why Rosebud was using non-permissible electronic equipment for 20 years without any citation? The explanation is that MSHA didn't know about it. Why not? I have heard, this is not on the record, I've heard these violations are hard to catch. All right. I don't recall that being in the record. But on a conference call with the first judge, Lesniak, he asked MSHA's counsel whether she knew of any violations issued at the Parkwood Rosebud mines. And she said she did not know of any. She didn't say there haven't been any. MSHA's known all along. MSHA, what's the word he used, tacitly approved the use of the equipment. That was not her answer. Her answer was that she did not know of any citations issued to these mines. And then the assistant secretary, in his decision, did say, maybe in a footnote, but he did say that there was no evidence that MSHA knew that the operators were using it. Let me ask you something, and don't go outside the record. If it's in the record, and I don't think it is from what you've just said, how is whether somebody is using mechanical surveying equipment or electronic hard to catch? How would that be possible? The MSHA inspector would have to be down there when the surveying was occurring. When the MSHA inspectors arrive at the mine, oftentimes miners know that the MSHA inspectors are there. You said they're doing this two or three times a week. Right. That's what I recall from the record. The surveys are there two to three days a week. And the inspectors may not be there while the surveyors are conducting their surveying work. But they inspect routinely. Yes, they do inspect the mines. You all inspect routinely, right. Yes, especially the ones with the spot inspections because they're gassier than others. So the amount of time the inspectors spend at the different mines varies. But they do inspect regularly. The second point I'd like to make very quickly is that the assistant secretary reasonably required multiple safety measures to assure that the use of the non-permissible electronic surveying equipment will not cause a mine explosion or fire. The assistant secretaries are reasonable given the risks involved. And so the assistant secretary properly exercised his discretion. Regarding the condition on cessation of production, the assistant secretary found that that would protect miners by reducing the likelihood that the equipment will encounter float coal dust and explosive concentrations of methane and result in a methane or dust ignition or explosion. The records indicate that non-permissible electronic surveying equipment is not intrinsically safe and has an ignition potential that mechanical surveying equipment does not have. There was testimony that the equipment can spark if there is something wrong with it. For example, loose connection. Even the act of shutting the equipment off might create a spark. And in addition, the batteries in the equipment can short out and cause an arc. Now, opposing counsel mentioned the case law and the credibility and the demeanor and the truthfulness, and the ALJs had the opportunity to observe the witnesses firsthand. That may be true, but looking at the assistant secretary's decisions, you can see that he did not impugn their demeanor or their truthfulness. He relied on the science. The assistant secretary looked at the reports of the operator's witnesses, Mr. Ryder and Mr. Hartzog, and he found that their opinions were not supported with test results or data, and he found in particular that Mr. Ryder's water immersion and dust swab tests were suspect for many reasons, one of which water is not a proper substitute for gas, there was moisture detected in all of the pieces of used equipment that he tested, and with regard to the dust inside the equipment, there just wasn't enough information about the use of the equipment underground since the equipment had been last serviced and cleaned. So for these reasons, the assistant secretary discounted their opinions. He did find that the secretary's, the MSHA's expert, Chad Huntley, the MSHA electrical engineer, opined that dust can enter non-permissible electronic equipment and layer on internal components, causing the equipment to overheat and ignite methane, and I just want to point out for the court that Ryder agreed that if there were sufficient openings, dust could layer inside the equipment and cause it to overheat, and that's a specific finding by the assistant secretary, and Ryder's report also indicates that there were several large openings in the instruments which may not be sealed or covered during use and operation to prevent gas and dust from entering the equipment. Quickly, with regard to the serving practices and ventilation systems, opposing counsel mentioned the dugout canyon mine. The assistant secretary specifically mentioned the dugout canyon mine. He also noted that the operators largely failed to provide record sites to him in evaluating their arguments. However, his review of the record indicated that the testimony was uncertain as to exactly what entries the surveyors are surveying in, where they set up, how close to the face, are they in the middle of the entry, are they downwind. There was testimony by the operators, witnesses, that usually we do this, seldom we do that. So the assistant secretary just found the records uncertain to support that argument. And with regard to tubing and curtains, your honors referenced earlier the fact that there are a lot of violations for ventilation requirements, and the assistant secretary noted that, as well as the fact that curtains and tubing could have breaches or other problems and not always work effectively. And with regard to the returns, which have ventilated the face, when production is occurring, they may have a greater accumulation of methane and dust. And so for these reasons, the assistant secretary is requiring that production cease on the section before the surveying equipment is used in these high-risk areas. Can I ask you about the third condition? Is that anything other than theoretical? I mean, what I'm hearing this morning is nobody's going to spend time coming up with mechanical equipment and so to say to them as a third condition, if there's viable mechanical equipment, you've got to go back to it. And the challenge is that it's not safety-related. But, you know, it sounds like a condition that's just never going to be met, and AMSHA didn't think it ever would be met from what I'm hearing this morning. Well, the condition also includes permissible electronic surveying equipment. So either permissible or mechanical. Either way, the secretary is going to revisit this if we get either of those options. And that is his intention. And he put everyone on notice that that is his intention. The last condition that the assistant secretary imposed was the float coal dust in suspension. He was concerned about float coal dust being rapidly placed in suspension and float coal dust layering on internal components of the equipment and causing the equipment to overheat and ignite methane. In his decision, the record points out that activity other than active mining can cause float coal dust to go into suspension. For example, fans, even exhaust from large pieces of equipment. So active mining can cause float coal dust, but there's other activity in the mine that can also cause float coal dust. So to the extent opposing counsel argues the condition is redundant, I would argue that's not the case. First and foremost, I see I'm out of time. Can I finish my thought? I just want to remind the court that the equipment the operators proposed to use, manufactured by Topcon, has specific explicit safety warnings not to use the equipment in underground coal mines and in gassy and dusty areas. And those warnings certainly support what the assistant secretary imposed. Other granted modifications have these two conditions in them, and there is no indication in the records that any of the mines to which those granted modifications apply have been unable to comply with the conditions. And those include some of the mines at issue in these cases. And so we would say in conclusion we would submit that the assistant secretary considered the relevant facts and articulated a rational connection between those facts found and those choices made. So counsel, the real objection is to the requirement to cease production? It sounds like the operators don't want to cease production. Because of the economic? Perhaps. Well, I'm just trying to understand if you say all these other mines aren't having any problems with complying with these conditions. You started out saying they won, but there are a couple of conditions they have to comply with. And as Judge Hedges has pointed out, one of them is in their favor, and the other two seem directly related to production activities. And you've indicated that as articulated by the assistant secretary, it's a limited shutdown. Yes. It's in the record that it's a small percent of surveyors' time spent. No, I don't think it's the question. All right. I'll let it go. Thanks. And I do believe that's why there was testimony in the record about and in the assistant secretary's decision about these conditions not being overly burdensome because it's not an extensive part of the surveyor's work to work in these high-risk areas. All right. Thank you. How much time does Mr. Moore have? Okay. I will keep it short, Brian. There are a couple of things I wanted to point out. While there is evidence in the record that in some mines they survey only two to three days a week in a particular section, there are other mines that they're in the sections every day. It just depends on how fast they're moving. In these mines? Excuse me? In the mines before us? The mines, in all of the underground mines, it can vary between how often they're in a section to a particular section to survey. If you like. No, no, no. I just want to be clear what we're dealing with in these cases. That's all. Yes. And counsel represented they're there two or three days a week. I believe the record also shows that in some sections they're in there every day. I see. Second, so we all understand. So just so I understand what this case is about, it's the shutdown of production that's the real problem here? That's the primary focus of our appeal. And that's just an economic concern? Well, it's an economic concern and disruption concern. I didn't mean just, but it's a concern. For example, realistically, if I have that and I go up on the section to survey, I tell the section foreman I'm there, and no matter where I am he's probably going to have to shut down because there's a case that you have this court decided years ago, called Freeman United, was a petition for modification case. And there was having to communicate across the section. It's not, you know, you don't have a line of sight or anything like that most times. Second of all, I want to make it clear that MSHA inspects mines regularly, particularly now that there are far fewer mines. There are not far fewer inspectors, and they have to go someplace. Some of the big mines, they're there every day, two to three inspectors. But I also want to say that Mr. Carmelino, who was in the industry and then went with MSHA, and I forget how long he was with MSHA, but it was some period of time, and he was in an area where he would have inspected R&P mines, well, rosebud mines. And those mines were mines that he surveyed with electronic equipment. To answer another question, I believe the majority of the industry has electronic surveying instruments. There are approximately 200 other petitions for modification. They're sitting out there waiting for this decision. There was an ALJ decision that's been issued that's waiting for Assistant Secretary's decision. But I understand the Secretary's position here is that they may be operating with electrical, but they're complying with the conditions. Well, the mines that have these petitions granted are exactly what you're referring to, Your Honor. Well, these petitions were granted with conditions, and apparently other mines where the petitions have been granted with conditions are complying with the conditions and using the electric equipment. The only mines that have actual granted petitions with these conditions are Rosebud and Canyon Fuel. Everybody else who's got a petition for modification is waiting, and their initial decisions from MSHA were that they were denied. All right, but so I'm clear. The applications for the modification included their own conditions. Yes. All right. Yes, they did, and that's what happened here. So you all understand that when Rosebud and Canyon Fuel filed their initial petitions, they didn't have all the conditions that now exist having gone through two hearings. There are a lot of conditions that have, like every other litigated petition for modification case, you get a lot more conditions as you go along. We just said enough is enough. If you look at what MSHA has granted on diagnostic and testing equipment and what we have, we should be able to get out from underneath the production cessation. I have nothing further unless there are more questions. All right. Thank you.
judges: Henderson, Rogers, Kavanaugh